## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

MICHAEL I. GOLDBERG, as Receiver for
Jay Peak, Inc., Q Resorts, Inc., Jay Peak Hotel
Suites L.P., Jay Peak Hotel Suites Phase II
L.P., Jay Peak Management, Inc., Jay Peak
Penthouse Suites L.P., Jay Peak GP Services,
Inc., Jay Peak Golf and Mountain Suites L.P.,
Jay Peak GP Services Golf, Inc., Jay Peak
Lodge and Townhouses L.P., Jay Peak GP
Services Lodge, Inc., Jay Peak Hotel Suites
Stateside L.P., Jay Peak GP Services
Stateside, Inc., Jay Peak Biomedical Research
Park L.P., AnC Bio Vermont GP Services,
LLC, Q Burke Mountain Resort, Hotel and
Conference Center, L.P., Q Burke GP, LLC,
Jay Construction Management, Inc., GSI of
Dade County, Inc., North East Contract
Services, Inc., and Q Burke Mountain Resort,
LLC,

Plaintiff,

v.

MITCHELL SILBERBERG & KNUPP, LLP,
a California limited liability partnership,
DAVID B. GORDON, an individual, and
DAVID B. GORDON, A PROFESSIONAL
CORPORATION, a New York professional
corporation,

Defendants.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Michael I. Goldberg (the "Receiver"), as Receiver for Jay Peak, Inc. ("Jay Peak"),

Q Resorts, Inc. ("Q Resorts"), Jay Peak Hotel Suites L.P. ("Phase I L.P."), Jay Peak Hotel Suites

Phase II L.P. ("Phase II L.P."), Jay Peak Management, Inc. ("Jay Peak Management"), Jay Peak

Penthouse Suites L.P. ("Phase III L.P."), Jay Peak GP Services, Inc. ("Jay Peak GP Services"), Jay Peak Golf and Mountain Suites L.P. ("Phase IV L.P."), Jay Peak GP Services Golf, Inc. ("Jay Peak GP Services Golf"), Jay Peak Lodge and Townhouses L.P. ("Phase V L.P."), Jay Peak GP Services Lodge, Inc. ("Jay Peak GP Services Lodge"), Jay Peak Hotel Suites Stateside L.P. ("Phase VI L.P."), Jay Peak GP Services Stateside, Inc. ("Jay Peak GP Services Stateside"), Jay Peak Biomedical Research Park L.P. ("Phase VII L.P."), AnC Bio Vermont GP Services, LLC ("AnC Bio Vermont GP Services"), Q Burke Mountain Resort, Hotel and Conference Center, L.P. ("Phase VIII L.P."), Q Burke Mountain Resort GP Services, LLC ("Q Burke GP Services"), Jay Construction Management, Inc. ("JCM"), GSI of Dade County, Inc. ("GSI"), North East Contract Services, Inc. ("NECS"), and Q Burke Mountain Resort, LLC ("Q Burke") (collectively, the "Receivership Entities"), sues David B. Gordon and David B. Gordon, a Professional Corporation (together with David B. Gordon, "Gordon"), and Mitchell Silberberg & Knupp, LLP as successor by merger with Richardson & Patel LLP ("MSK"), and states:

## INTRODUCTION

1.      The Receiver brings this action on behalf of the Receivership Entities alleging legal malpractice and breach of fiduciary duty against Defendants, MSK and Gordon.

2.      In 2013, the U.S. Securities and Exchange Commission ("SEC") began investigating the private placement offerings made by Receivership Entities to foreign investors through the EB-5 Immigrant Investor Program (the "EB-5 Program").  Those offerings funded the expansion of the Jay Peak and Burke Mountain resorts and the supposed construction of a biomedical facility in northern Vermont.

3.      Beginning in mid-2013, MSK and Gordon represented the Receivership Entities and their principals Ariel Quiros ("Quiros") and William Stenger ("Stenger") relating to the SEC

investigation.  MSK and Gordon held themselves out to the Receivership Entities as experts in securities law.

4.      Shortly after taking on the representation, MSK and Gordon learned that, in derogation of certain of the Receivership Entities' private placement memoranda and the U.S. securities laws, Quiros had directed the commingling of tens of millions in investor funds among the projects' various phases and entities in an effort to cover construction shortfalls.  MSK also learned that Quiros had financed his purchase of the Jay Peak resort in 2008 by diverting millions of dollars of EB-5 investor funds held by certain Receivership Entities.

5.      In derogation of their reasonable duties of care, competence, loyalty and diligence, MSK and Gordon negligently failed to advise the Receivership Entities that these actions violated the securities laws.  MSK and Gordon also negligently failed to advise the Receivership Entities of conflicts of interest existing among the Receivership Entities and between the Receivership Entities and Quiros.

6.      As a result, the violations continued and the Receivership Entities' exposure increased throughout the term of Defendants' representation.  For example, in March 2014 more than $18 million in investor funds approved to pay for construction-related services on Phase VII were used to pay down a margin loan that had been used to fund previous phases.

7.      MSK and Gordon learned about the misuse of the Phase VII funds no later than May 22, 2014, when Quiros testified about it at an SEC investigative session.  Quiros testified — wrongly — that the $18 million was "his money" in the form of development-related fees.  But rather than taking steps to prevent, mitigate or rectify further damage to the Receivership Entities by either i) telling Quiros that the use of those funds constituted a violation of the private placement memoranda and securities laws, ii) warning other decisionmakers within the Receivership Entities

about it, or iii) withdrawing its representation of the Receivership Entities to the extent the commingling did not stop, MSK and Gordon breached their fiduciary duties to those entities by continuing to represent the Receivership Entities and taking none of the steps delineated above as a reasonable and prudent practitioner would have taken under these circumstances.

8.      Within three days of Quiros' testimony, MSK and Gordon drafted several declarations and obtained signatures from Phase VII's South Korean vendor, AnC Biopharm, Inc. ("AnC Biopharm"), stating that although it was owed money, AnC Biopharm considered the debt "paid" by virtue of the money having gone to Jay Peak and then JCM instead (which used the money to pay down the margin loan on other phases).  As MSK and Gordon knew, these declarations described a story concocted after-the-fact in an attempt to excuse and explain the use of funds to pay down the margin loans in violation of the private placement memoranda and securities laws.  The owners of AnC Biiopharm had a longstanding relationship with Quiros.  They went along with the story, and MSK and Gordon facilitated it in an attempt to insulate Quiros from the damning testimony he had just given.

9.      Furthermore, in 2014 and 2015, MSK and Gordon took actions to delay (at best) and mislead (at worst) an investigation opened by Vermont regulators.  MSK and Gordon affirmatively represented to those regulators that EB-5 investor money was "safe" and "secure," when they knew that investor money was being used to pay shortfalls in prior phases and to fund Quiros' purchase of the Jay Peak Resort.

10.     As a result of MSK and Gordon's actions, Phases VII and VIII continued, more investor monies were solicited, the Receivership Entities' exposure increased and MSK and Gordon continued to be paid by the entities.

11.     MSK and Gordon also failed to properly advise several of the Receivership Entities

regarding their rights to coverage under insurance policies issued by Ironshore Indemnity, Inc. ("Ironshore") that could have covered fees and costs paid to MSK for defending the SEC investigation, as well as other losses now facing the Receivership Entities. This, and Defendants' failure to provide appropriate notice to the insurer, resulted in the Receiver's inability to recover the full amounts from the policies (ie., $10 million), and caused the Receiver to settle with the insurer for a fraction of the policies' coverage.

12.     As set forth in more detail below, MSK's and Gordon's conduct fell below the standard of care for any attorneys, let alone those holding themselves out as experts in the areas of securities and corporate law, and breached fiduciary duties owed to the Receivership Entities.

## PARTIES AND RELEVANT NONPARTIES

### A.     Plaintiff

13.     The Receiver is a natural person over the age of 21 and otherwise *sui juris*. He is a citizen and resident of the State of Florida. The Receiver represents the interests of the Receivership Entities. The Receiver was appointed in this District. *See* Order Granting Plaintiff Securities and Exchange Commission's Motion for Appointment of Receiver, *SEC v. Quiros*, No. 16-CV-21301-GAYLES (S.D. Fla. April 13, 2016).

### B.     Defendants

14.     Defendant Mitchell Silberberg & Knupp, LLP, a law firm, is a California limited liability partnership registered to do business in the State of New York. MSK's principal place of business is Los Angeles, California. MSK is successor by merger with the law firm Richardson & Patel, LLP ("R&P"). At all times material, Gordon was a partner at MSK. As such, MSK is vicariously liable for the actions of Gordon.

15.     Defendant David B. Gordon is a citizen and resident of the State of New York, and

through Defendant David B. Gordon, a Professional Corporation, is a partner at the MSK law firm. Prior to that, Gordon was a partner with R&P.  David B. Gordon is an attorney licensed in the State of New York.

16.     Defendant David B. Gordon, a Professional Corporation, is a New York professional corporation based in the State of New York.

**C.     Receivership Entities and Relevant Nonparties**

17.     Quiros is a citizen and resident of the State of Florida.  Quiros was the owner, officer and director of Q Resorts and the chairman of Jay Peak.

18.     Stenger is a citizen and resident of the state of Vermont.  Stenger was the Director, President, and CEO of Jay Peak.  He was the president and director of the general partner of the first Jay Peak project offering and was the sole officer or director of the general partner of the second through sixth offerings. All six offerings were set up as limited partnerships.  Stenger was, along with Quiros, a principal in the seventh offering's (Phase VII) general partner.

19.     Jay Peak, Inc. ("Jay Peak") is a Vermont corporation with its principal place of business formerly in Jay, Vermont.  Jay Peak operated the Jay Peak Resort in Jay, Vermont.  Jay Peak, in conjunction with others, served as the manager or developer of the first six phases of the projects.

20.     Q Resorts, Inc. ("Q Resorts") is a Delaware corporation with its offices formerly in Miami, Florida.  Q Resorts was the 100% owner of Jay Peak.

21.     JCM is a Vermont corporation owned and formerly controlled by Quiros.  JCM was registered to do business in Florida and had its principal place of business in Miami, Florida.

22.     Jay Peak Hotel Suites L.P. ("Phase I") is a Vermont limited partnership with its principal place of business formerly in Jay, Vermont.  Between December 2006 and May 2008,

Phase I raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests to build a hotel.  Phase I began offering and selling securities in the form of limited partnership interests in December 2006, when Jay Peak was still owned by MSSI.

23.     Jay Peak Hotel Phase II L.P. ("Phase II") is a Vermont limited partnership with its principal place of business formerly in Jay, Vermont.  Between March 2008 and January 2011, Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house.

24.     Jay Peak Management is a Vermont corporation and was the general partner of Phases I and II.  It was also a wholly-owned subsidiary of Jay Peak.  Stenger was the company's president.

25.     Jay Peak Penthouse Suites ("Phase III") is a Vermont limited partnership with its principal place of business formerly in Jay, Vermont.  Between July 2010 and October 2012, Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build a 55-unit "penthouse suites" hotel and an activities center.

26.     Jay Peak GP Services is a Vermont corporation and was the general partner of Phase III.  At all times relevant, Stenger was listed as the director, and was its only principal.

27.     Jay Peak Golf and Mountain Suites L.P. ("Phase IV") is a Vermont limited partnership with its principal place of business formerly in Jay, Vermont. Between December 2010 and November 2011, Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities.

28.     Jay Peak GP Services Golf is a Vermont corporation and was the general partner of Phase IV.  At all times relevant, Stenger was listed as the director, and was its only principal.

29.    Jay Peak Lodge and Townhouses L.P. ("Phase V") is a Vermont limited partnership with its principal place of business formerly in Jay, Vermont.  Between May 2011 and November 2012, Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build 30 vacation rental townhouses, 90 vacation rental cottages, a café and a parking garage.

30.    Jay Peak GP Services Lodge is a Vermont corporation and the general partner of Phase V.  At all times relevant, Stenger was listed as the director, and was its only principal.

31.    Jay Peak Hotel Suites Stateside L.P. ("Phase VI") is a Vermont limited partnership with its principal place of business formerly in Jay, Vermont.  Between October 2011 and December 2012, Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center.

32.    Jay Peak GP Services Stateside is a Vermont corporation and the general partner of Phase VI.  At all times relevant, Stenger was listed as the director, and was its only principal.

33.    Jay Peak Biomedical Research Park L.P. ("Phase VII") is a Vermont limited partnership with its principal place of business formerly in Newport, Vermont.  From November 2012 through April 2016, Phase VII raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility.

34.    AnC Bio Vermont GP Services is a Vermont limited liability company and was the general partner of Phase VII.  At all times relevant, its managing members were Quiros and Stenger.

35.    Phases I through VII are collectively referred to as the "Jay Peak Limited Partnerships."

36.     Jay Peak Management, Jay Peak GP Services, Jay Peak GP Services Golf, Jay Peak GP Services Lodge, Jay Peak GP Services Stateside, and AnC Bio Vermont GP Services are collectively referred to as the "Jay Peak General Partners."

37.     Q Burke Mountain Resort Hotel and Conference Center, L.P. ("Phase VIII") is a Vermont limited partnership with its principal place of business formerly in East Burke, Vermont. Between June 2013 and April 2016, Phase VIII raised approximately $53 million from 106 investor s through an EB-5 offering of limited partnership interests to build a hotel with 112 rooms, a conference center, and an outdoor pool.

38.     Q Burke GP Services is a Vermont limited liability company and was the general partner of Phase VIII.

39.     Each of the Jay Peak Limited Partnerships and Phase VIII is referred to as a "Limited Partnership" or collectively as the "Limited Partnerships."  Each of the Jay Peak General Partners and Q Burke GP Services is referred to as a "General Partner" or collectively as the "General Partners."

40.     Mont Saint-Sauveur International, Inc. ("MSSI") is a Canadian firm that owned and operated Jay Peak from 1978 through mid-2008, when it sold Jay Peak to Quiros.

41.     North East Contract Services ("NECS") is a dissolved Florida limited liability company with its principal office formerly located at 3460 Stallion Lane, Weston, Florida 33331. William J. Kelly, an associate of Quiros, was at all relevant times the sole member and manager of NECS.

## JURISDICTION AND VENUE

42.     On April 13, 2016, the Honorable Darrin P. Gayles entered an order in the SEC Action appointing the Receiver as receiver over the Receivership Entities, their subsidiaries,

successors and assigns (the "Receivership Order").  This action is brought to accomplish the objectives of the Receivership Order.

43.     Because the Receivership Order was entered in this District, the Courts in this District have subject matter jurisdiction over this matter.

44.     In addition, diversity subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

45.     This Court has personal jurisdiction over Gordon and MSK because the causes of action alleged herein arise from Defendants' tortious acts within Florida, their engaging in business in Florida and causing injury to persons or property within Florida while engaged in solicitation and services within Florida.

46.     In addition, Defendants at all times material engaged in significant contacts within the State of Florida.  Several of the Receivership Entities they represented, including Q Resorts, JCM and GSI, were based in and operated out of Miami.  Their client and principal contact, Quiros, lived in Key Biscayne, Florida.  Defendants engaged in frequent and ongoing communications with Quiros and the Florida-based Receivership Entities into Miami-Dade County via telephone and email.  The SEC investigation was centered in Miami.  Gordon attended in person numerous investigative sessions conducted by the SEC in Miami.  Gordon prepared subpoena responses and produced documents to the SEC in Miami.  The causes of action alleged in this Complaint arise in substantial part from the SEC Investigation in Miami and communications between Gordon, Quiros and the Receivership Entities in Miami relating to that investigation.  Defendants received significant fees and cost reimbursements of nearly $800,000 for their representation of the Receivership Entities in the SEC Investigation.

47.     Defendants have engaged in substantial and not isolated activity in Florida even after they stopped representing the Receivership Entities.  Once the Receivership Order was entered, Defendants continued to represent Quiros in at least three other actions based in Miami after the SEC Investigation concluded.  Defendants represented Quiros in *Daccache v. Raymond James Fin., Inc.*, No. 16-cv-21575-FAM (S.D. Fla.) (Moreno, J.); *Goldberg v. Raymond James Fin., Inc.*, No. 16-cv-21831-JAL (S.D. Fla.); and *Calero v. Raymond James & Assocs., Inc.*, No. 2016-017840-CA-01 (Fla. 11th Cir. Ct.).  In a filing in *SEC v. Quiros*, Defendants and their local counsel claimed a total of nearly $3 million in fees and costs for work representing Quiros, including work in these Florida-based cases.

48.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claim occurred in this District, and because Defendants are subject to this Court's personal jurisdiction with respect to this action.  Venue is also proper because the Receivership Order was entered in this District.

## FACTUAL ALLEGATIONS

### A.     The Development of Jay Peak

49.     Jay Peak is a ski resort in northern Vermont, near the Canadian border.  The Canadian company MSSI owned and operated Jay Peak beginning in 1978.  In the mid-2000s, MSSI sought to further develop the resort, and so it began raising funds through the EB-5 Program, a federal program offering immigrants permanent U.S. residency in exchange for investments in enterprises that create jobs in the United States.

50.     MSSI sold the resort to Q Resorts in mid-2008.  Q Resorts and its subsidiary Jay Peak continued to develop the resort with funds raised through the EB-5 Program.

51.     The development ultimately was comprised of eight phases.  Each phase had a

specific purpose and a certain sum of investor funds to accomplish that purpose.  The first six phases called for the development and expansion of a ski resort in Jay, Vermont.  Phase VII called for the purchase of land and development of a biomedical research facility in Newport, Vermont. Phase VIII called for the development and expansion of another hotel and ski resort in East Burke, Vermont.

52.     MSSI devised the plans for Phase I and Phase II, and began raising funds for Phase I in December 2006, before negotiating the sale to Quiros.  By May 2008, MSSI had secured $17.5 million from 35 Phase I investors, through an EB-5 offering of limited partnership interests, to build a hotel.

53.     Phases I and II were structured as separate limited partnerships, with Jay Peak Management serving as general partner.

54.     The Limited Partnerships' governing materials required that the partnership funds be used for each phase's stated purpose and be kept separately.  Investor funds could not be used to pay off investors from earlier phases, cover shortfalls in other project accounts, purchase securities as collateral for loans or for personal use.

**B.     <u>Quiros Uses Investor Funds to Purchase the Resort</u>**

55.     In June 2008, at Quiros's request, MSSI transferred the money it had raised ($11 million for Phase I and $7 million for Phase II) from accounts at People's United Bank ("People's Bank") for Phases I and II to corresponding accounts at Raymond James & Associates ("Raymond James") for Phases I and II.  From there, the funds were transferred to accounts controlled by Quiros at Raymond James.  Quiros then transferred $7.6 million and $6 million out of these accounts to pay for the purchase of Jay Peak.  Other members of management, including Stenger, did not know that Quiros had improperly used investor funds to purchase Jay Peak.

56.     Only $3.4 million remained in the account, but Quiros covered up the shortfall by securing a $7.6 million loan from Raymond James.  Raymond James agreed to lend $7.6 million to Quiros if he used the resulting $11 million to purchase U.S. Treasury bonds that would serve as collateral for the loan.

57.     A loan of this sort — with securities as collateral — is known as a "margin loan" and is inherently very risky.  Lenders typically permit lower maintenance margins for safer securities, such as Treasury bonds.  A lower maintenance margin, in turn, allows for a larger loan. Quiros accordingly used Treasury bonds as collateral to minimize the maintenance margin on the margin loan, maximizing the amount of money he could borrow.

58.     The margin loan also hid the lack of funds in the Raymond James accounts.  After the margin loan referenced above was extended, the Phase I account at Raymond James held Treasury bonds worth $11 million, matching the $11 million in cash that the account should have held.  But the account also owed $7.6 million to Raymond James for the loan; of the $11 million of partnership funds, only $3.4 million actually remained.

59.     Quiros adopted the same approach for the Phase II account at Raymond James on the same day.  MSSI transferred $7 million of Phase II investor funds to Quiros's Phase II account, and Quiros diverted $6 million from the account to purchase Jay Peak.  This left only $1 million of investor funds.  On June 25, 2008, Quiros obtained a $6 million margin loan from Raymond James and purchased $7 million in Treasury bonds to collateralize the loan. As a result, the Phase II account contained $7 million in Treasury bonds (thus appearing to have the $7 million in investor funds that it should have had), but in fact it owed $6 million to Raymond James.

60.     These early-phase transactions violated the Phase I and II Limited Partnership Agreements.  The offering memorandum for Phase I included a section entitled "Source and Use

of Investor Funds" that detailed precisely how the Phase I hotel project would allocate the total pool of $17.5 million in partnership funds among construction costs, furnishing and equipment, utilities and common areas, and developer fees.

61.     Similarly, the Phase II offering memorandum provided, in a paragraph entitled "Use of Proceeds," that Phase II funds would be applied to (i) land acquisition, permits, and construction for the main hotel complex, and (ii) "the costs of building the ancillary projects" such as an indoor water park, ice arena, and bowling alley.  The source and use of funds section of the offering materials for Phase II set forth a detailed breakdown of how the $75 million in Phase II funds would be allocated.  The permitted uses of partnership funds did not include purchasing Treasury bonds to secure a margin loan or purchasing Jay Peak from MSSI.

**C.     The Later Phases: Investor Funds Continue to Be Commingled Between Phases to Pay Down Margin Loans**

62.     From October 2008 until February 2009, there continued to be substantial balances on margin loans secured by partnership funds that were transferred from Phases I and II accounts at People's Bank to accounts at Raymond James, even though the offering materials prohibited encumbering partnership property.  By February 2009, the combined margin loan balances of the two accounts had reached $23.8 million.  Funds continued to be transferred from the People's Bank Phases I and II escrow accounts to the Raymond James accounts, at which point the funds became collateral for margin loans not permitted under partnership's governing documents.

63.     As with the initial two phases, Phases III through VIII were promoted to investors as involving the purchase of real estate and development of other projects, such as hotels, suites, recreational facilities and a biomedical research facility.  Again, each Phase was structured as a separate limited partnership, which had its corresponding general partners.

64.     Investor funds from Phase III through VIII were used to take out and pay down

risky, unauthorized loans.  Approximately $32.5 million was used from Phase III, approximately $15.8 million from Phase IV and approximately $5.6 million from Phase V to make payments on a margin loan related to Phase I and Phase II funds.

65.     In a separate transaction on February 24, 2012, approximately $5.8 million from Phase VI and approximately $16.6 million from Phase V was used to make payments on the same margin loan.

66.     Between October 2013 and June 2015, approximately $1,213,626 was wired from Phase VIII to Jay Construction Management, Inc., and approximately $3.4 million to NECS. Those funds were used to pay expenses not associated with Phase VIII, including construction expenses associated with Phases V and VI, or were commingled with funds from the earlier Limited Partnerships.

67.     Partnership funds were also used for personal expenses and taxes.  On April 12, 2013, Quiros transferred $3 million in Phase VII investor funds to GSI, his wholly-owned company.  Six weeks later, on May 30, 2013, Quiros used $2.2 million of that money to buy a luxury condominium at Trump Place in New York City.

68.     Between March and June of 2013, Quiros transferred $4.2 million in Phase VII funds to pay corporate taxes to the IRS and the State of Vermont for JCM — even though Phase VII had no responsibility for those tax liabilities.

69.     An accountant for the SEC testified that he documented repeated instances in which funds from each of the Jay Peak EB-5 projects were commingled with funds from other Jay Peak EB-5 projects.  All told, the SEC documented commingling of more than $350 million of partnership funds, concluding that such funds "frequently flowed in a circular and roundabout manner between various accounts and entities."

70.     Thus, partnership funds of each phase were commingled, pledged as collateral for margin loans and transferred to other Quiros-controlled entities for Quiros' personal and other non-partnership purposes.

**D.     MSK and Gordon Represent Quiros and the Receivership Entities**

71.     By mid-2013, Quiros, Stenger and certain of the Receivership Entities received subpoenas from the SEC in connection with an investigation titled "In re Jay Peak, Inc., FL-3815" (the "SEC Investigation").

72.     The Receivership Entities, through Quiros, retained MSK (at the time, R&P) and Gordon in connection with the SEC Investigation.

73.     Quiros signed a formal retainer agreement on behalf of the particular Receivership Entities that had received subpoenas to that point, Jay Peak, Q Resorts, JCM and GSI.

74.     Quiros and Stenger reasonably believed and expected that Defendants represented each of the other Receivership Entities as well, given the interrelated relationship of those entities and the applicability of the SEC Investigation to those entities.

75.     MSK and Gordon held themselves out as counsel for all of the Receivership Entities.

**E.     MSK and Gordon Owed Duties to the Receivership Entities**

76.     As attorneys for the Receivership Entities, MSK and Gordon owed them duties of care, loyalty, competence and diligence.  Competent representation requires reasonable legal knowledge, skill, thoroughness and preparation.  Moreover, because MSK and Gordon held themselves out as having particular skill and knowledge in securities law, they had a special duty to act with the care, competence and diligence normally exercised by lawyers having such skill and knowledge.

77.     MSK and Gordon also had a duty of loyalty to the Receivership Entities and were required to avoid conflicts of interest.  Where a conflict arises, a lawyer cannot commence or continue the representation without the client's informed consent.  Specifically, the lawyer has a duty to inform the client of the conflict or potential conflict, communicate adequate information for the client to make an informed decision, and explain the material risks of the proposed course of conduct and reasonably available alternatives.

78.     MSK and Gordon had a duty to keep the Receivership Entities reasonably informed about the status of the representation and to explain matters to the extent reasonably necessary to permit the clients to make informed decisions regarding the representation.  Additionally, Defendants were required to consult with the Receivership Entities about any relevant limitation on Defendants' conduct when Defendants knew or reasonably should have known that the entities expected assistance not permitted under the Rules of Professional Conduct or the law.

79.     Furthermore, as attorneys for entities acting through their constituents, MSK and Gordon had a duty to act in the best interests of the Receivership Entities.  Specifically, MSK and Gordon had a duty to take steps to protect the Receivership Entities from any officer, employee or other person associated with the entities who is acting in a matter related to the representation that is a violation of a legal obligation to the entities or a violation of law that is likely to injure the entities.  Where, despite the lawyer's efforts, the person insists upon such a course of action, the lawyer should withdraw its representation from the entity.

**F.      MSK and Gordon Breach Their Duties to the Receivership Entities**

80.     Upon commencing the representation in 2013, Defendants received and reviewed the Receivership Entities' documents, including the offering documents and other governing materials for the Limited Partnerships.  Defendants learned the structure, function and relationship

among the various Receivership Entities.  Defendants also learned about the commingling of those entities' funds between phases.

81.     In a memorandum dated October 31, 2013, Defendants told Quiros that "money of one company must be maintained and kept separate from money of another company, and there should be no intermingling of funds."

82.     Defendants failed to emphasize or even explain to Quiros or the Receivership Entities that this commingling of funds violated the placement memoranda and federal securities laws.  Defendants also did not share the memorandum with anyone at the Receivership Entities other than Quiros.  In other words, MSK and Gordon seemed to be serving only one master, Quiros, at the expense of its other clients, the Receivership Entities.  The violations continued, and the entities' exposure increased.

83.     Over the following months, Defendants became aware that the commingling of funds continued.  On May 22, 2014, MSK and Gordon represented Quiros at an SEC investigative session.  Quiros testified that he continued to commingle investor funds between phases.  He testified that in March 2014, $18.2 million in Phase VII investor funds earmarked to pay a South Korean firm for construction- and design-related invoices was instead transferred to a Raymond James account and used to pay down margin debt incurred in earlier phases.

84.     Quiros also testified to treating all investor money the same, describing Phases I through VI as "one phase."  Quiros claimed it was "one program within one resort."  Quiros testified that "once [an individual] invests, it is now my money.  It is totally my money." Quiros further testified that once investor funds were transferred to a Quiros-controlled account, he could "do whatever I want" with them.

85.     MSK and Gordon never counseled Quiros or the Receivership Entities that Quiros'

views ran contrary to the private placement memoranda and, when acted upon, resulted in violations of securities laws.

86.     At the same May 2014 session, Gordon also heard Quiros testify to having used more than $13 million of EB-5 investor funds toward the purchase of the Jay Peak Resort in 2008, also a violation of the private placement memoranda and securities laws.

87.     MSK and Gordon failed to advise the Receivership Entities of the wrongfulness and potential consequences of the continued commingling of funds, and did nothing to stop those actions from continuing.

88.     Instead, MSK and Gordon worked to help Quiros justify it.  Immediately after Quiros' testimony, MSK and Gordon drafted several declarations for Phase VII's South Korean vendor, AnC Biopharm, stating that although it was owed money, AnC Biopharm considered the debt "paid" by virtue of the money having gone to Jay Peak and then JCM instead (which used the money to pay down the margin loan on other phases).  As MSK and Gordon knew, these declarations described a story concocted after-the-fact in an attempt to excuse the use of funds to pay down the margin loans in violation of the private placement memoranda and securities laws. The owners of AnC Biiopharm had a longstanding relationship with Quiros.  They went along with the story, and MSK and Gordon facilitated it in an attempt to insulate Quiros from the damning testimony he had just given.

**G.     MSK and Gordon Fail to Tell Others**

89.     In addition to and/or alternatively to the duty to advise Quiros and the Receivership Entities that Quiros' actions violated the securities laws, MSK and Gordon had duties to disclose these activities to innocent decisionmakers within the Receivership Entities or, at the very least, withdraw their representation so that new and separate counsel for each separately represented

person and/or entity could learn on their own what had occurred and take action in connection therewith.

90.     There were numerous such people within the Receivership Entities, including but not limited to Stenger, Steven Wright, Heather Whipkey, Ida Ovies and George Gulisano, none of whom were counseled by MSK and Gordon that securities violations were being committed (or, for that matter, even told about it).

91.     MSK and Gordon knew that Stenger, for example, testified that he did not know that Quiros had used investor funds to purchase Jay Peak or that Quiros was commingling investor funds.  MSK and Gordon defended Stenger at SEC investigative sessions in which Stenger testified that he had no idea that Phase VII investor funds were used to pay off the margin loans rather than that phase's vendors.  Stenger also testified as to his understanding that investor funds were not used to cover any cost overruns.

92.     After sitting through that testimony, MSK and Gordon were fully aware that one of the Receivership Entities' principals, Quiros, knew about the commingling and misuse of investor funds among phases, while another principal, Stenger, did not.  MSK and Gordon did not disclose this to Stenger or counsel him as to the ramifications.

**H.      MSK and Gordon Fail to Warn the Receivership Entities of Conflicts of Interest**

93.     On September 21, 2015, the SEC wrote to Gordon to "express our concern that you and your firm may be in the position of conflicting interests in representing Mssrs. Stenger and Quiros and the other witnesses and entities who have provided testimony or responded to document requests."

94.     Instead of withdrawing, MSK and Gordon obtained written conflict checks from 11 of the Receivership Entities.  On October 8, 2015, Defendants sent a waiver of conflicts letter

to Jay Peak, Jay Peak Management, Q Resorts, Jay Peak GP Services Golf, Inc., AnC Bio Vermont GP Services, Q Burke Mountain Resort GP Services, Jay Peak GP Services, Jay Peak GP Services Stateside, Jay Peak GP Services Lodge and JCM.

95.     Despite what Defendants had learned from the Quiros testimony about the commingling of funds by Quiros among the Receivership Entities, Defendants wrote in the letter "[w]e are not currently aware of any conflicts among you in the defense of the Investigations."

96.     MSK and Gordon continued to bill and collect hundreds of thousands of dollars in attorney's fees from the entities.  By failing to withdraw and/or to disclose and warn, MSK and Gordon breached their duty to prevent, mitigate and rectify further fraud and injury to the Receivership Entities.

I.      **Defendants Mislead Vermont Regulators Investigating Jay Peak**

97.     During the course of Gordon's representation, the Vermont Department of Financial Regulation commenced its own investigation into Jay Peak (the "DFR Investigation"). The local agency responsible for regulating the Jay Peak EB-5 program, the Vermont Agency of Commerce and Community Development ("ACCD"), began asking questions clearly centered around its concern for the security of investor funds.  MSK and Gordon met with the ACCD in late 2014 and, while touting the "maximum amount of safety" and "maximum security" of Quiros' use of Treasury bills on margin, neglected to disclose what they had learned: that project costs were not being met as those Treasury bills matured, and that investor funds from later phases were being used to supplement the retirement of margin debt from earlier phases.

98.     Moreover, when in November 2014 the ACCD specifically requested a description of the uses of Phase VII funds to date, MSK and Gordon in a November 24, 2014 letter failed to disclose that the payment to JCM of $18.2 million was used to pay down the margin balance on

monies borrowed to complete previous phases.  Defendants instead described the payments as being made to JCM "for distribution rights, equipment and architectural fees."

99.    On February 27, 2015, Defendants sent a letter seeking to convince the Vermont DFR that any future investment in Phases VII and VIII would be handled legally and in conformance with regulatory requirements.  In fact, Defendants knew or reasonably should have known that they would not be handled as such.

100.    Because Defendants failed to respond candidly, or to withdraw their representation of Quiros and the Receivership Entities, the Vermont DFR allowed the Phase VII and VIII offerings to go forward.

**J.    The Receivership Entities Suffer Millions in Damages
After Defendants Take on the Representation**

101.    With knowledge of Quiros' actions and the reasonable certainty that those actions would continue, Defendants failed to prevent, mitigate or rectify injury to the Receivership Entities.  Defendants failed to advise the Receivership Entities that violations of the private placement memoranda and securities laws were occurring.  Defendants failed to reveal Quiros' actions to any innocent decisionmaker within the Receivership Entities, or to any third party that could have stopped it, including but not limited to the Vermont regulators.  And Defendants failed to withdraw from representing Quiros or the Receivership Entities.

102.    As a result of Defendants' breaches, investor money continued to come in, increasing the Receivership Entities' exposure.  That exposure increased by tens of millions of dollars after Defendants began representing Quiros and the Receivership Entities in mid-2013. The Receivership Entities' unrecovered damages on Phases VII and VIII alone exceeds $50 million.

103.    Had MSK and Gordon met their duties by giving competent legal advice, identified and disclosed conflicts, warned innocent decisionmakers, disclosed the true status of the projects to Vermont regulators and/or withdrawn their representation of the Receivership Entities, then the Receivership Entities' damages would have been avoided or greatly reduced.

**K.    The Ironshore Policies**

104.    From 2011 to 2015, Ironshore issued to Q Resorts a series of directors, officers and private company insurance policies with a $10 million policy limit (collectively, the "Ironshore Policies").

105.    Q Resorts and its subsidiaries, including Jay Peak, were insureds under the Ironshore Policies.

106.    The Ironshore Policies provided insurance coverage for claims made during their respective policy period and covered all loss and legal expenses resulting from the wrongful acts of Quiros.

107.    The Ironshore Policies also define "claim" to include an investigation by the SEC, provided that an insured was served with a subpoena in connection with such investigation.

108.    Accordingly, several of the Receivership Entities, including Q Resorts and Jay Peak, were entitled to make a claim to insurance coverage from Ironshore in connection with the SEC Investigation under one or more of the Ironshore Policies.  Ironshore could have been paying Gordon and MSK for their services and, in the event another related "claim" arose from the same underlying facts (such as an SEC enforcement action), Ironshore would have then been obligated to provide coverage to the Receivership Entities for that subsequent claim as well.

109.    As a condition precedent to coverage under the Ironshore Policies, an insured must provide written notice of an insurable claim to Ironshore within the applicable policy period.

110.     Gordon and MSK — despite representing the Receivership Entities and regularly sending invoices to Quiros — failed to advise the Receivership Entities regarding their rights and obligations under the Ironshore Policies.

111.     Instead, Gordon and MSK sought payment from the Receivership Entities.

112.     Had Gordon and MSK advised the Receivership Entities regarding the Ironshore Policies and provided notice to Ironshore, the fees and costs paid to Gordon and MSK in connection with the SEC Investigation could have been covered by Ironshore.

113.     After the Receiver was appointed (as described in the section below), the Receiver demanded coverage from Ironshore for all losses resulting from the SEC Action.

114.     But Ironshore denied coverage because the SEC Action was related to the SEC Investigation, and the insureds (and Quiros) had failed to provide written notice of the SEC Investigation within the applicable policy period.  In other words, Ironshore declined coverage because the SEC Action was deemed to have "accrued" along with the SEC Investigation, and the insureds did not seek coverage under the Ironshore Policies for the SEC Investigation (or even given notice of the SEC Investigation).

115.     The Receiver was forced to bring an action against Ironshore for a declaration of coverage (the "Coverage Action").

116.     Meanwhile, MSK sued Ironshore in New York to recover amounts purportedly owed to it for services provided to Quiros.

117.     As a result of the Coverage Action, the Receiver received less than $1 million by way of settlement.

118.     Had MSK and Gordon properly advised its clients and timely sought coverage from Ironshore for legal fees and expenses associated with the SEC Investigation, Ironshore could have

been obligated to pay (i) all fees and costs paid to the Gordon and MSK in connection with the SEC Investigation and prior to the SEC Action and (ii) all losses facing the Receivership Entities as a result of the SEC Action, up to $10 million.

**L.      The SEC Sues Quiros, Stenger and the Receivership for Securities Violations**

119.     On April 12, 2016, the SEC filed a civil enforcement action against Quiros, Stenger and the Receivership Entities, *see SEC v. Quiros et al.*, No. 16-cv-21301-DPG (S.D. Fla.) (Gayles, J.) (the "SEC Action"), charging the defendants with violations of numerous provisions of the federal securities laws.  Specifically, the SEC brought claims for violations of sections 17(a)(1)-(3) of the Securities Act; violations of section 10(b), Rules 10b-5(a)-(c), and section 20(a) of the Exchange Act; and aiding and abetting violations of section 10(b) and Rule 10b-5(b) of the Exchange Act.

120.     The Receivership Order authorizes the Receiver to (i) take immediate possession of all property, assets and estates of every kind of the Receivership Entities, (ii) investigate the manner in which the affairs of the Receivership Entities were conducted and (iii) institute legal actions for the benefit and on behalf of the Receivership Entities and their investors as deemed necessary by the Receiver to collect funds or assets that were wrongfully misappropriated or transferred from the Receivership Entities or otherwise traceable to the funds raised from investors in the Receivership Entities, including, but not limited to, seeking imposition of constructive trusts, disgorgement of profits, recovery and/or avoidance of fraudulent transfers under Florida Statutes 726.101 et seq.

121.     Shortly after the SEC Action was filed, Quiros (individually) retained Gordon and MSK to represent him in the SEC Action and various other lawsuits filed by the Receiver, investors and the Vermont DFR.

122.    On November 21, 2016, Judge Gayles entered a preliminary injunction against Quiros (the "Preliminary Injunction"), finding, among other things, that he had "committed many deceptive and manipulative acts across all . . . phases in furtherance of a scheme to defraud the EB-5 investors." The Court later entered a permanent injunction against Quiros based on these facts, prohibiting him from, among other conduct, violating Section 17(a) of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934.

123.    The State of Vermont also filed suit against Quiros and other alleged conspirators, settling those claims in July 2018 for roughly $2 million.

124.    The Receivership Entities have faced claims and other losses as a result of the SEC Action in excess of $10 million.

125.    All conditions precedent to this action have been waived or have occurred.

126.    Gordon, MSK, and the Receiver entered into a tolling agreement for the Receiver's claims that tolled the applicable statute of limitations from February 9, 2017 to May 9, 2019.

### COUNT I
### LEGAL MALPRACTICE
**(Against all Defendants)**

127.    The Receiver re-alleges and incorporates paragraphs 1 through 126 above as if fully set forth herein.

128.    MSK and Gordon owed the Receivership Entities duties to exercise the reasonable skill, knowledge, care, competence and diligence commonly possessed by a member of legal profession.

129.    And because MSK and Gordon held themselves out as experts in securities law, they owed a special duty to exercise act with the reasonable skill, knowledge, care, competence and diligence possessed by lawyers having such expertise.

130.    MSK and Gordon also had a duty of loyalty to the Receivership Entities and were required to avoid conflicts of interest.

131.    MSK and Gordon breached these duties by, among other breaches, failing to adequately advise the Receivership Entities that the commingling of investor funds between phases constituted a violation of the private placement memoranda and the securities laws.

132.    MSK and Gordon also breached their duties by failing to inform the Receivership Entities of the conflict or potential conflict among themselves and with Quiros.

133.    MSK and Gordon also breached these duties by failing to adequately advise the Receivership Entities of their rights and obligations under the Ironshore Policies, or to properly advise the Receivership Entities to seek coverage under the Ironshore Policies.

134.    As a direct and proximate result of MSK and Gordon's breach of their duties to the Receivership Entities, the Receivership Entities suffered damages.

WHEREFORE, Plaintiff, as Receiver for the Receivership Entities, demands judgment against Defendants for compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable, and such other relief the Court deems just and proper.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### (Against all Defendants)

135.    The Receiver re-alleges and incorporates paragraphs 1 through 126 above as if fully set forth herein.

136.    The Receivership Entities reposed trust and confidence in their legal representatives MSK and Gordon.

137.    MSK and Gordon knowingly accepted that trust and confidence, owing fiduciary duties to the Receivership Entities, including but not limited to duties of care and loyalty.

138.   Gordon and MSK breached their duties by, among other breaches, failing to adequately disclose conflicts of interest to the Receivership Entities; failing to inform and/or warn the Receivership Entities of the severity and consequences of Quiros' actions; failing to prevent, mitigate or rectify further fraud and further damage to the Receivership Entities by either disclosing it or withdrawing representation; serving certain clients to the detriment of others; failing to protect the Receivership Entities from Quiros and his actions; and promoting and/or concealing further fraud and/or damage through their interactions with the regulators.

139.   As a direct and proximate result of these breaches, the Receivership Entities suffered damages.

WHEREFORE, Plaintiff, as Receiver for the Receivership Entities, demands judgment against Defendants for compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable, and such other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Receiver requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: May 8, 2019                                  Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
*Counsel for the Receiver*
201 South Biscayne Boulevard
Citigroup Center, 22nd Floor
Miami, FL 33131
Telephone:  (305) 403-8788
Facsimile:  (305) 403-8789

By: /s/Jeffrey C. Schneider
JEFFREY C. SCHNEIDER, P.A.
Florida Bar No. 933244
Primary: jcs@lklsg.com
Secondary: lv@lklsg.com
JASON KELLOGG, P.A.
Florida Bar No. 0578401
Primary: jk@lklsg.com
Secondary: mco@lklsg.com